## KNOX *vs.* FAIR.

1. Where, after the introduction of proof, in a trial of the right of property
to a slave, tending to show possession by the defendant in execution for
three years without demand made and pursued by due course of law, the
question at issue is whether such possession continued up to the time
when the lien of the execution attached, the defendant having before
that time left the State, it is admissible to prove that the rent of a house,
occupied by the slave, was, without authority, paid by a third person out
of the funds of the defendant, and that he, when informed of it, ratified
the act.

2. Whether proof of the ostensible insolvency of a defendant in execution,
without evidence of his ability to purchase property, notwithstanding
such insolvency, is admissible to show a motive in taking the title to the
property, purchased by him, in the name of another?—QUERE. How-
ever this may be, with such additional evidence, it is clearly competent.

3. It is the duty of the court to pay particular attention to every part of
the testimony adduced during the progress of a trial, but where many
witnesses are examined and the facts detailed by them are numerous, the
court commits no error if it charges the jury hypothetically, and refuses
to instruct them that there is no testimony tending to prove a particular
fact.

Error to the Circuit Court of Montgomery. Tried before the
Hon. Thos. A. Walker.

THIS was a trial of the right of property in several slaves, to-
wit, a woman by the name of Sarah and her children, levied.
upon on the 16th April 1849, under an execution in favor of
the plaintiff in error against John B. Taylor, and claimed by
the defendant in error. The facts disclosed by the bill of

exceptions are substantially these: The slaves had belonged to
Cater & Holt, trustees, previous to 12th Nov. 1844—on that
day they sold to E. Y. Fair for $1200. The money was handed
to *Fair by Sarah*, who paid it to C. & H., but the proof did
not show from whom Sarah got the money. In 1842 J. B.
Taylor rented a house and paid for it, and Sarah lived in it. In
1844 Sarah and children lived in a house, occupied and con-
trolled by Taylor, and waited on him and remained there till it
was burnt, which occurred some weeks before the sale afore-
said by *Cater & Holt*. On the day after the house was burned
Cater told her to go and stay at his house, which she did for
two months; but while there Cater neither directed nor con-
trolled her labor, but she paid wages for her time, which she
had done for several years previously. Said slave, for a few
months after, lived at two other places, for one of which she
paid rent; and as soon as J. B. Taylor procured another house
she and her children were seen living there and waiting on
Taylor. The slave Sarah was industrious and a good seam-
stress and dress-maker, but there was no evidence that she
ever received money for such services. Sarah lived with
Taylor until November term of Circuit Court 1848, when J.
B. Taylor left,—an indictment having been found against him.
In a few days Sarah left the house and hired one for one month,
when one Coleman rented one for her, in which she lived till
levied on. E. Y. Fair refused to pay for this rent, saying he
had no money to pay for her in that way. There was no evi-
dence that claimant paid taxes on said slaves, or that he received
hire for them, or gave any orders to them or in relation to them,
or exercised any control over them or had any possession of
them at any time, save in the form of delivery. There was no
evidence that Taylor held said slaves under any contract or
asserted in any manner ownership over them. There was no
evidence of a demand made by claimant of Taylor of said slaves
and pursued by due course of law. Since 1842 said slaves had
remained in the county in which the levy was made. The
plaintiff offered to prove by Coleman that the rent of the house,
rented for said slaves by him, was paid by a sale of part of
Taylor's furniture before the levy, and that Taylor sanctioned
the sale for that purpose. This was offered as tending to prove
continuous control and possession by Taylor, but was excluded

by the court. For the same purpose plaintiff offered to prove that Taylor sanctioned and ratified the renting of said house, which was also excluded. The plaintiff proposed to introduce records of judgments against Taylor rendered in 1842, and the returns thereon by the sheriff, "no property" found, and to prove that said judgments were still unsatisfied, for the purpose of showing Taylor's insolvency, and an inducement, if he held property, to hold it in the name of another; and for the further purpose of showing, in connection with the facts of his possession, and that the money paid by claimant was handed to him by Sarah, that the said money had been furnished by Taylor for that purpose; but the court *excluded* the testimony. The plaintiff asked the court to charge " that there was no evidence that the claimant since the date of the sale has made any demand of Taylor or pursued it by due course of law up to the time the execution went into the sheriff's hands. The court refused to give this, but charged that if there was any such evidence he had not heard it ; that part of the time his attention had been drawn off the case, and he had not undertaken to recollect all the evidence : All he could say was he recollected no such evidence, and the jury must ascertain the facts. To the several rulings of the court and its refusal to charge as requested the plaintiff excepted and now assigns them as error.

ELMORE & YANCEY, for the plaintiff:

1. A continued possession of slaves for the space of three years by one, there being no deed or writing proved or acknowledged in Circuit or County Court and recorded, and no demand having been made and pursued by due course of law, is *per se* fraudulent as to creditors and purchasers of the party so possessing—and the absolute property is with the possession. Clay's Dig. 255, § 2.

2. In the absence of proof to show that the possession of defendant in execution was tortious or in any way objected to by the pretended owner or claimant, such possession will be presumed to be a loan.—Myers v. Peck, 2 Ala. 649.

3. Such a possession does not create a mere presumption of title in the possessor, but as to creditors authorises a legal conclusion that the title is in him. It vests the title in the possessor.—Same, page 659; Gay v. Moseley, 2 Munford, 543.

33

4. Even a relinquishment of such a possession, or a return of the slaves to the pretended lender or claimant, after the expiration of the three years, cannot divest the title of the loanee. Garths' Ex'r, v. Barksdale, 4 Munford, 101; Myers v. Peck, 2 Ala. 648.

5. In this case the possession of the slaves at one time by Coleman, who assumed to act for Taylor—if Taylor afterwards approved and ratified that act of Coleman's—was the possession of Taylor.—Lazarus v. Shearer, 2 Ala. 718.

6. The declaration of Taylor to Coleman relative to the acts of Coleman, who assumed to act as agent of Taylor, are admissible as proof of agency.—Downer v. Morrison, 2 Grattan, 237.

7. In cases of fraudulent conveyance of property, the great indebtedness of the grantor at the time, is a badge of fraud.— Paine v. Griffin, 7 Blackf. 485; Borland v. Mayo, 8 Ala. 104. There can be no difference in principle between the case cited and a case in which a defendant in execution fraudulently conceals property.

8. The proof of insolvency of Taylor was a fact tending to prove fraud in this transaction, in connection with the facts stated.

9. When facts are clear and indisputable, the court should charge directly upon the facts. The court should have given the charge asked for by plaintiff, as to want of demand.—Swift v. Fitzhugh, 9 Porter, 39.

10. The court may in all cases inform the jury that there is no evidence, or no evidence sufficient in law to establish a fact sought to be proved.—Farmers' Bank of Maryland v. Duvall, 7 Gill & Johns. 78; 2 Watts, 107.

Belser & Harris, for the defendant:

1. The conversations had with Taylor by the witness Coleman were not only irrelevant, but inadmissible. Taylor could not have been a witness if present at the trial, and what was said by him was no part of the *res gestæ* and was said out of the presence of claimant and after the commencement of the *lis mota*.—Currelle v. Stout, 10 Ala. 796; Webster v. Smith, ib. 429; Bradford v. Hagerty, 11 Ala. 701-2; Rembert v. Brown, 14 Ala. 360.

2. Taylor's possession of the slave was not a continuous one

Knox v. Fair.

for three years, under the facts of the case.—Maul v. Hayes, 12 Ala. 499; Gresset v. Agee, 14 ib. 354.

3. The question attempted to be raised on the rejection of the proof of Taylor's insolvency is clearly irrelevant.

4. The law will presume the possession is with the title, where there is no *distinct* possession; and the title was in Fair by the delivery of the deed, &c.

5. There is no evidence in the record going to show that Taylor ever at any time held possession of the slave with the *assent* of Holt & Cater or of Fair.    In fact the bill of exceptions *repudiates the idea* that they or either of them at any time *ever consented in any way to his possession.*

6. There is no evidence that Taylor ever advanced the money to the slave, and insolvency would prove, if fairly construed, *that he did not have the ability to furnish it.*    The court will not presume a *fraudulent* intention where the facts authorise a *fair* one.

7. If Fair did not allow Taylor the possession of his slave, then the possession was a tortious one on the part of Taylor, and the possession during the whole time was with Fair.    An *actual* possession must be a *valid* one.

8. If Taylor had possession of the negro and abandoned her before he had her three years previous to the time when the execution went into the hands of the sheriff, then the possession of the slave *constructively* was with the title, which was in Fair.

DARGAN, C. J.—It has been heretofore decided by this court, that if a slave be lent and continue in the possession of the borrower for more than three years, and the lender regain the possession before any creditor obtains a lien upon the slave, it cannot be afterwards subjected to the debts of the borrower on account of such possession.—Maul v. Hays, 12 Ala. 499. It therefore became material to inquire not only whether Taylor had had three years' possession of the slaves with the consent or permission of the claimant, but also whether that possession continued up to the time that the execution came into the hands of the sheriff; for until then no lien could be created on the slaves by the execution.    For this purpose, we think the testimony of Coleman although by no means conclusive, was nev-

ertheless admissible-evidence. He stated that after Taylor left the State the negro woman hired a house herself for a month and paid the rent; that he then without authority from any one rented a house for her, to which she and her children removed; that he sold some of the furniture of Taylor and paid the rent; and that, seeing Taylor afterwards, he informed him what he had done, whereupon Taylor approved and ratified the act. This was whilst the slaves were in the house and before the levy. Now I admit that the subsequent recognition of an unauthorised act of another cannot give validity to it so as to defeat a right or an estate vested in a third person, (Story on Agency, § 246; 5 East. 491,) but I cannot think this principle applicable to the case before us. There was some evidence tending to show that Taylor had had the possession of the slaves before he left Alabama, and although it was by no means conclusive, the proof offered was admissible in this view of the case. Had the jury come to the conclusion that the slaves were in the possession of Taylor at the time he left the State, it would then have been their duty to inquire whether that possession was continued by him afterwards; for if one in the actual possession of property should leave home or abandon his domicil, without carrying the property with him, yet if he intends to retain the possession or control over it, it would require some positive act of ownership by him, who had the legal title, to divest such possession; otherwise the mere absence from home would defeat an actual possession, without regard to the *animus revertendi*, or the intention to retain the possession. Upon the hypothesis then that Taylor had the possession when he left the State, we think his subsequent recognition of the acts of Coleman was evidence tending to show that he did not intend to abandon his possession and control of the slaves. There is also another view in which this testimony was admissible. That a slave occupies a house rented by one who is not the legal owner, is some evidence that the slave is in the possession of the party who rents the house; and although Coleman stated he had rented the house without authority, yet he paid the rent with the funds of Taylor, who ratified the act. The term then belonged to Taylor, and the slaves were in his house for the time being. The court erred in rejecting the testimony.

2. In regard to the rejection of the judgments and execu-

tions against Taylor, to show his insolvency previous to the purchase by the claimant, the court is not fully agreed. I admit that in cases of fraud, very remote circumstances are admissible, for slight circumstances grouped together frequently mark the character of a transaction and develop the fraud; but when a remote circumstance is rejected by the court below, before we can say that the court erred, we must be able to see that in some aspect of the case the rejected circumstance or evidence, if admitted, might have benefitted the party offering it. Here the plaintiff in execution offered to prove the insolvency of Taylor. He contends that this would have shown that he had a motive in taking the title to any property he might have purchased in the name of another. I think, however, that this proof would have been *prima facie* beneficial to the claimant, and to have authorised the plaintiff to introduce it as evidence of a motive, he should at least have shown that notwithstanding Taylor's visible insolvency, he had the means or the capacity to raise the money, and as the record furnishes no such evidence, I do not think the court erred in rejecting the proof of Taylor's insolvency. But we all agree in this, that if it had been shown that Taylor was able to furnish the money with which the slaves were purchased, then the judgment and executions showing his insolvency would have been admissible, even if they had been entitled to but little weight in the consideration of the jury.

3. The court was requested to charge the jury that there was no evidence of any demand of the slaves made by the claimant of Taylor, or pursued by due course of law, from the time he purchased the slaves until the execution came into the hands of the sheriff. This charge the court refused, but informed the jury that he had heard no such evidence, but that his attention had been drawn from the case a part of the time, and he had not undertaken to charge his memory with all the evidence. When there is no evidence tending to prove a particular fact, the court may so instruct the jury, whether the evidence be oral or written. If the evidence is all written, it is the duty of the court so to instruct them, if it in no point of view tends to prove the particular fact.—Swift v. Fitzhugh, 9 Porter, 39; Bank of Maryland v. Duval, 7 Gill & J. 78. But I know of no case that holds it to be erroneous, should the judge decline so to charge, when the testimony is all given orally from the stand and the

facts deposed to numerous and minute. Indeed such a practice would lead to the necessity of taking down all the evidence in writing that the court might clearly see whether there was any proof tending to prove the particular fact. It is certainly the duty of the presiding judge to pay particular attention to every part of the testimony that he may be enabled correctly to instruct the jury on the questions of law involved, but when many witnesses are examined and the facts detailed by them numerous, we would not hold that the court erred, should he charge the jury hypothetically, and refuse to charge that there was no testimony tending to prove a particular fact.

Let the judgment be reversed for the error we have noticed, and the cause remanded.